HANSON PIPE & PRODUCTS,
INC., Plaintiff,

v.

BRIDGE TECHNOLOGIES LLC, and
Con/Span Bridge Systems, Inc.,
Defendants.

No. 4:04–CV–127.

United States District Court,
E.D. Texas,
Sherman Division.

Dec. 30, 2004.

604

Daniel V. Flatten of Jenkens and Gilchrist, Houston, TX, Anil Gollahalli and John Patrick Heptig of Jenkens & Gilchrist, Dallas, TX, for Plaintiffs.

Roy William Hardin and Charles Edward Phipps of Locke, Liddell & Sapp, Dallas, TX, Paul Christopher Van Slyke of Locke, Liddell & Sapp, Houston, TX, for Defendants.

### *ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS*

SCHELL, District Judge.

This matter is before the court on:

1. "Motion of Defendant, Bridge Technologies LLC, to Dismiss, Stay, or Transfer Venue" (Dkt.# 23), filed June 15, 2004; and

2. "Motion of Defendant Con/Span Bridge Systems, Ltd., to Dismiss or Transfer Venue" (Dkt.# 24), filed June 15, 2004.

The court also has before it "Plaintiff Hanson's Response to Defendants' Motions to Dismiss, Stay or Transfer Venue" (Dkt.# 19), filed June 3, 2004; and "Plaintiff Hanson's Opposition to Defendants' 'Motions' to Dismiss, Stay or Transfer Venue" (Dkt.# 26), filed June 25, 2004.

Additionally, the court has received "Plaintiff Hanson's Motion for Preliminary Injunction and Brief in Support" (Dkt.# 6),

filed May 4, 2004. Though the court will not rule on its substance at this time, Plaintiff's motion for preliminary injunction is necessary to place the current dispute in the appropriate context. As such, the court will review its contents to fully develop the background of this matter.

After careful review of the motions, the supporting briefing and the relevant law, the court is of the opinion that Defendants' motions to dismiss should be GRANTED.

## I. BACKGROUND

### A. The Modular Bridge Business

Defendant Con/Span was the assignee of U.S. Patent No. 4,595,314 and related patents ("the Con/Span Patents"). These patents describe the fabrication of concrete arches, which are used for the construction of bridges and culverts. Figure 3, taken from U.S. Patent No. 4,595,314 and reprinted below, is a representation of what one of these arches looks like.

Figure 1, reproduced below and also taken from the U.S. Patent No. 4,595,314, demonstrates how the pre-cast arches might be used to create both a bridge and a culvert.

Fabrication of a "pre-cast modular bridge section" requires the use of a "form." Concrete is poured into the form, and concrete reinforcements are placed. The reinforcements consist of "a grid 26 of crossing steel reinforcing rods or members...."[1] The steel rods are (1) "embedded within the vertical sidewalls 22 relatively close to the outer surfaces," (2) "embedded within the top wall 24 relatively close to the upper surface," and (3) "embedded within the top wall relatively close to the inner surface."[2] Figure 2, re-

---

1. U.S. Patent No. 4,595,314, Col. 2, Lns. 52–53 (issued June 17, 1986).

2. *Id.,* Col. 2, Lns. 52–60.

produced below from the patent, demonstrates the placement of the reinforcements.

FIG-2

Plaintiff Hanson manufactures its version of the pre-cast modular bridge sections in-house. To do so, Hanson purchases custom-made forms from outside vendors. Hanson purchases some of these forms from a company called Spillman Company ("Spillman"), which manufactures custom steel forms for pre-cast concrete products.

In addition to fabrication of its steel forms, Hanson outsources the design of its pre-cast bridge sections. HansonArch bridge sections are designed by Simpson Gumpertz & Heger, Inc. ("SGH"), an engineering and design firm.

### B. The Hanson–Con/Span License Agreement

Plaintiff Hanson licensed from Con/Span the right to fabricate the modular bridge and culvert components described in the Con/Span Patents.[3] Under the license agreement, Hanson paid Con/Span royalties for the use of the Con/Span's "Licensed Technology"[4] and the Con/Span trademark.[5]

Hanson paid royalties to Con/Span for the use of its Licensed Technology and Trademark for over 13 years. On December 28, 2003, however, all of the Con/Span patents expired. Thus, the license agreement terminated in accord with paragraph 13 of that agreement, which states that the agreement would "continue until the expiration date of the last U.S. patent included in the licensed technology. . . ."[6]

### C. The Dispute

Presently, Hanson continues to compete in the pre-cast modular bridge and culvert

---

**3.** Hanson is the successor to Joelson Concrete Pipe Company, Inc., who is the signatory to the license agreement. The parties do not dispute that Hanson is privy to the agreement.

**4.** The license agreement defines "Licensed Technology" to include Con/Span's "entire right, title and interest in and to technology involving the design, construction and installation of certain precast concrete culvert sections, precast wing-walls and precast footers" as well as the contents of certain patents and Con/Span's "special know-how relating to the construction of the Culvert Systems, in addition to other proprietary and confidential information relating to the Culvert Systems

. . . ." Appx. to Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue, Ex. 5 at 1 (License Agreement).

**5.** The license agreement specifically defined the term "Trademark" to mean "CON/SPAN" and required Hanson to use the trademark CON/SPAN on each culvert system it manufactured and sold. Appx. to Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue, Ex. 5 at 1–2 (License Agreement).

**6.** Appx. to Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue, Ex. 5 at 5 (License Agreement).

market. Hanson provides "pre-cast modular systems" to contractors, who use them to construct bridges, culverts, and other underground structures. After the termination of the license agreement, however, Hanson quit adorning its arches with the CON/SPAN trademark. Instead, Hanson now manufactures and markets its arches as the HansonArch bridge system.

One of Hanson's competitors is Defendant Bridge Technologies ("BridgeTek"). According to Hanson, BridgeTek is closely affiliated with Con/Span. Specifically, Hanson states that Con/Span designs the bridge sections that BridgeTek markets, sells and installs. Additionally, Con/Span owns "a significant portion of BridgeTek's stock." [7]

Hanson and BridgeTek competed for a contract to supply modular bridge systems to an Ohio corporation named Beaver Excavating Co. Both Hanson and BridgeTek submitted bids for the supply contract, but because Hanson was the low bidder, Beaver Excavating informed Hanson that it would be awarded the contract.

After winning this contract, Hanson claims that BridgeTek and Con/Span began "systematically contacting Hanson's existing and potential customers and suppliers, claiming that working with Hanson or purchasing HansonArch bridge systems will infringe Con/Span's intellectual property rights." [8] Specifically, Hanson alleged that "Con/Span and BridgeTek have threatened at least one customer, Beaver Excavating Co ('Beaver'), and three suppliers, Spillman Co. ('Spillman'), Simpson, Gumpertz & Heger Inc. ('SGH') and Cleco Engineering Corp. ('Cleco')." [9]

After the threats were made, Beaver Excavating awarded the contract to BridgeTek, for which Hanson claims damages in excess of $200,000.00.

In addition to Defendants' alleged interference with Hanson's Beaver Excavating contract, Hanson alleges that Defendants interfered with its ability to acquire the custom forms necessary to fabricate its bridge modules.

Specifically, Hanson claims that Defendants sent a cease and desist letter to Spillman, stating that Spillman's manufacture of custom forms for Hanson would infringe upon Con/Span's trademark, trade dress and/or other intellectual property rights. In this letter, Con/Span threatened to sue Spillman unless Spillman agreed not to supply any more custom forms to Hanson. Accordingly, Spillman contacted Hanson and stated that it would supply to Hanson neither the forms it was currently obligated to supply under existing contracts nor the forms for which it was negotiating an agreement to supply. In short, Spillman cut Hanson off.

Finally, Hanson claims that Defendants sent a cease and desist letter to SGH, stating that SGH's design activities for Hanson would violate confidences, breach contracts, and infringe upon Con/Span's trademarks. Apparently, the letter asked SGH to explain its intentions with respect to its design activities for Hanson so that Con/Span could determine whether it would seek recourse.

Significantly, Hanson claims that its bridge systems, their design, and their construction do not infringe any of Defendants' intellectual property rights, including Defendants' rights in their purported

7. Pl. Hanson's Mot. for Prelim. Inj. & Br. in Supp. at 1–2.

8. Pl. Hanson's Mot. for Prelim. Inj. & Br. in Supp. at 3.

9. *Id.*

trademark, trade dress, proprietary information, and confidential information.

### D. *The Complaint*

Hanson has filed a twelve-count complaint, which alleges generally that Con/Span and BridgeTek have competed unfairly and have tortiously interfered with Hanson's existing and prospective contracts by knowingly making false claims to Hanson's suppliers and customers regarding Defendants' intellectual property rights. Hanson requests declaratory judgment finding that Defendants' do not possess the alleged intellectual property rights. Hanson also seeks an order permanently enjoining Defendants from committing the tortious acts described in Hanson's complaint.

In addition to its complaint, Plaintiff Hanson moved the court for preliminary injunction on May 4, 2004, preventing BridgeTek and Con/Span "from continuing to intimidate and threaten Hanson's customers and suppliers." [10] Defendants have not filed responses to this motion. However, on May 12, 2004, each Defendant filed a motion requesting that the court either dismiss the case or transfer venue.[11] In addition, BridgeTek moved the court to stay the proceedings pending its determination of whether the parties should be required to arbitrate this dispute. Twelve days later, Defendants jointly moved the court to stay the preliminary injunction proceedings until after the court could rule

on Defendants' motions to dismiss and transfer.[12]

It wasn't until after Defendants filed these motions that Plaintiff filed its First Amended Complaint. In response to the amended complaint, Defendants re-urged their motions to dismiss, stay or transfer venue.[13]

The court will now consider Defendants' motions to dismiss, which creates a *de facto* ruling of sorts on Defendants' motion to stay the preliminary injunction proceedings.

### II. DEFENDANTS' MOTIONS TO DISMISS

As noted above, each Defendant has filed two motions to dismiss. In Defendant BridgeTek's June 15, 2004, motion to dismiss, stay or transfer venue, BridgeTek states that "[b]ecause Hanson's First Amended Complaint does not modify the substance of its Original Complaint, BridgeTek incorporates it['s] Motion to Dismiss, Stay or Transfer the Original Complaint filed on May 12, 2004, in its entirety." [14] Likewise, Plaintiff Hanson's response to BridgeTek's June 15, 2004, motion to dismiss incorporates Hanson's original response to BridgeTek's previous motion.

Similarly, Con/Span re-urged its May 12, 2004, motion to dismiss on June 15, 2004. In this motion, Con/Span argues that this court lacks personal jurisdiction over Con/Span.

---

10. Pl. Hanson's Mot. for Prelim. Inj. & Br. in Supp. at 1.

11. Def. Bridge Technologies LLC's Mot. to Dismiss, Stay, or Transfer Venue & Br. in Supp. (Dkt.# 7); Def. Con/Span Bridge Systems, Ltd.'s Mot. to Dismiss or Transfer Venue & Br. in Supp (Dkt.# 8).

12. Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp at 1–2.

13. *See* Mot. of Def., Bridge Technologies LLC, to Dismiss, Stay, or Transfer Venue; Mot. of Defendant Con/Span Bridge Systems, Ltd., to Dismiss or Transfer Venue.

14. Mot. of Def., Bridge Technologies LLC, to Dismiss, Stay, or Transfer Venue at 1.

Additionally, both Defendants argue that because all claims against them are subject to arbitration under a valid arbitration agreement, the court should dismiss this case without prejudice and order arbitration.

### A. *The Court Lacks Personal Jurisdiction Over Defendant Con/Span*

Con/Span is an Ohio corporation with its principal place of business in Dayton, Ohio. Upon Con/Span's motion, therefore, it is necessary to consider whether personal jurisdiction is appropriate in this case. In that regard, the Fifth Circuit has held:

> [t]o determine whether a federal district court sitting in diversity has personal jurisdiction over a nonresident defendant, the district court considers first whether exercising jurisdiction over the defendant comports with due process, and if due process is met, the district court turns to the extraterritorial jurisdictional rules of the state in which it sits to determine whether personal jurisdiction is conferred.

*Religious Tech. Ctr. v. Liebreich,* 339 F.3d 369, 373 (5th Cir.2003) (citing *Interfirst Bank Clifton v. Fernandez,* 844 F.2d 279, 282 (5th Cir.1988); *see also Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990)).

It is well known that "[t]he Texas Long Arm Statute is coextensive with the confines of due process." *Id.* (citing Texas Long Arm Statute, TEX. CIV. PRAC. & REM. CODE ANN. § 17.041 (Vernon 2001) *et seq.; Gessmann v. Stephens,* 51 S.W.3d 329, 335 (Tex.App.-Tyler 2001, no pet. h.); *Interfirst Bank Clifton,* 844 F.2d at 282). Thus, "questions of personal jurisdiction in Texas are generally analyzed entirely within the framework of the Constitutional constraints of Due Process." *Id.* In other words, it is not necessary to do a separate analysis of the Texas long-arm statute.

Personal jurisdiction may be exercised over a foreign defendant consistent with the Constitution when the defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). The Court in *International Shoe* provided no bright lines demarcating the specific boundaries of "minimum contacts," but did suggest a structure for the analysis.

First, the contacts must be significant enough to "make it *reasonable,* in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." *Id.,* at 317, 66 S.Ct. 154. In analyzing reasonableness, the district court may perform an " 'estimate of the inconveniences' which would result to the corporation from a trial away from its 'home' or principal place of business . . . ." *Id.* (citing *Hutchinson v. Chase & Gilbert,* 45 F.2d 139, 141 (2nd Cir.1930) (L.Hand, J.)).

Next, the court must analyze the type of contacts the foreign defendant has with the forum state. To begin, personal jurisdiction is not appropriate if a foreign corporate defendant is not "present" within the state. *Id.,* at 316, 66 S.Ct. 154. "Presence," the Court instructs, is judged on a spectrum. On the one end:

> '[p]resence' in the state . . . has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given.

*Id.,* at 317, 66 S.Ct. 154 (citations omitted). Moreover, "there have been instances in which the continuous corporate operations

within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Id.,* at 318, 66 S.Ct. 154 (citations omitted). Such contacts have been said to give rise to "general" personal jurisdiction. *Felch v. Transportes Lar–Mex SA De CV,* 92 F.3d 320, 324 (5th Cir.1996).

Even without substantial and continuous contacts, the Court anticipated that, in some circumstances, the single act of a corporate agent within the forum state could give rise to personal jurisdiction over the corporation when the act was of "such a nature as to justify the fiction" that the corporation has implicitly "given its consent to service and suit" through its "presence in the state through the acts of its authorized agents." *International Shoe Co.,* 326 U.S. at 318, 66 S.Ct. 154. Such contacts give rise to "specific" personal jurisdiction. *Felch,* 92 F.3d at 324. "Specific jurisdiction is appropriate when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action." *Id.* (quoting *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.1994)).

On the opposite end of the spectrum, Due Process "does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations." *International Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154 (citing *Pennoyer v. Neff,* 95 U.S. 714, 733, 5 Otto 714, 24 L.Ed. 565 (1877)). Additionally, the Court held that occasional or incidental acts of corporate agents within the forum state can be insufficient to confer jurisdiction. Specifically:

the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough

to subject it to suit on causes of action unconnected with the activities there.

*Id.,* at 317, 66 S.Ct. 154 (citations omitted).

Ultimately, the Court in *International Shoe* hinged its analysis on the extent to which "a corporation exercises the privilege of conducting activities within a state" and "enjoys the benefits and protection of the laws of that state." *Id.,* at 319, 66 S.Ct. 154. When "[t]he exercise of that privilege [gives] rise to obligations" and "those obligations arise out of or are connected with the activities within the state," due process is met. *Id.*

After *International Shoe,* courts began to state the personal jurisdiction analysis as a more succinct, two-prong test. "First, the nonresident defendant must have 'purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with that forum state.'" *Felch,* 92 F.3d at 323 (citations omitted). Minimum contacts are established by contacts sufficient to create either general or specific jurisdiction. *Id.,* at 324. "Second, the exercise of jurisdiction over the nonresident defendant must not 'offend "traditional notions of fair play and substantial justice."'" *Id.* (citations omitted).

### 1. General Jurisdiction

"General jurisdiction exists where a 'defendant's contacts with the forum state are substantial and continuous and systematic but unrelated to the instant cause of action.'" *Religious Tech. Ctr.,* 339 F.3d at 374 (quoting *Central Freight Lines, Inc. v. APA Transp. Corp.,* 322 F.3d 376, 381 (5th Cir.2003); and citing *Helicopteros Nationales de Columbia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

Con/Span argues that it does not have "substantial, continuous and systematic contacts with Texas that would permit the

exercise of general jurisdiction." [15] Specifically, Con/Span claims to have "no employees, offices, real estate or bank accounts in Texas." [16]

Nonetheless, Con/Span admits to having some contacts with Texas. For instance, Con/Span admits to having "a licensee that makes sales in Texas." [17] This licensee is BridgeTek. Con/Span is the parent corporation of BridgeTek, owns the majority of BridgeTek's stock, has representation on BridgeTek's board of directors, and shares common officers with BridgeTek.[18] As the court will explain below, however, this does not make Con/Span and BridgeTek the same corporation.

Additionally, Con/Span maintains a website, which, *inter alia,* "permits visitors from any location to view pictures of projects that were constructed BY OTHERS utilizing Con/Span information throughout the United States, including ... projects in Texas." [19] Though the website does reference Texas, Con/Span states:

> [t]he website does not target Texas residents; it merely displays all projects utilizing Con/Span information and permits visitors to search for projects in *any* state. The website offers no special content for Texas residents such as special deals or discounts. The website is nothing more than the equivalent of national advertising.[20]

In addition to the admitted contacts, Plaintiff Hanson alleges that Con/Span maintains the following contacts with Texas. First, Hanson makes much of the allegation that Con/Span "routinely interacts with BridgeTek, its Texas sales arm," stating that Con/Span "designs and sells bridge systems in Texas through Bridge-Tek." [21] According to Hanson, "BridgeTek does nothing but sell Con/Span bridge systems .... " [22] Moreover, Hanson has produced a statement made in CE News, a trade publication, indicating that Con/Span employees have visited Texas to provide on-site technical support.[23]

This is the extent of the contacts alleged, and it appears to the court that these contacts are insufficient to justify the imposition of general jurisdiction.

Fifth Circuit precedent establishes that the presence of a corporate subsidiary within the forum state does not subject the parent corporation to general personal jurisdiction. *Alpine View Co., Ltd. v. Atlas Copco AB,* 205 F.3d 208, 219 (5th Cir. 2000). In order to justify general jurisdiction over the parent based on the presence of the subsidiary, the party moving the court to assert jurisdiction must demonstrate that the subsidiary is an "alter ego" of the parent. *Id.,* at 218. To establish that a subsidiary is the alter ego of the parent, the party seeking jurisdiction must show that "[t]he degree of control exer-

---

**15.** Mot. of Def., Con/Span Bridge Sys., Ltd., to Dismiss or Transfer Venue at 9.

**16.** *Id.,* at 10.

**17.** *Id.*

**18.** *Compare* Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 5–6, *with* Mot. of Def., Con/Span Bridge Sys., Ltd., to Dismiss or Transfer Venue at 11. Defendant Con/Span essentially acknowledges the existence of these facts alleged by Plaintiff Hanson.

**19.** Mot. of Def., Con/Span Bridge Sys., Ltd., to Dismiss or Transfer Venue at 13.

**20.** *Id.*

**21.** Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 5–6.

**22.** *Id.,* at 6.

**23.** *Id.,* at 7 (citing Ex. 15 at 3 (CE News article)).

cised by the parent must be greater than that normally associated with common ownership and directorship." *Id.,* at 219 (quoting *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1160 (5th Cir.1983)). Even "100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations." *Id.; see also Gardemal v. Westin Hotel Co.,* 186 F.3d 588, 593 (5th Cir.1999) (holding that a subsidiary is not an alter ego of its parent even when the corporations "are closely tied through stock ownership, shared officers, financing arrangements, and the like"). In order to find an alter ego relationship, "there must be evidence of complete domination by the parent." *Gardemal,* 186 F.3d at 593.

In this case, the court has no evidence that BridgeTek is dominated by Con/Span. In the *Gardemal* decision, the Fifth Circuit stated that "[t]he control necessary ... is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." 186 F.3d at 594 (citation omitted). "Thus," the Fifth Circuit held, "one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil." *Id.*

One factor that the Fifth Circuit considers "critical" in the alter-ego analysis is whether the subsidiary is undercapitalized and therefore unable to pay a judgment if necessary. *Id.* The Plaintiff in this case

has presented no evidence of undercapitalization. Moreover, the Plaintiff has presented neither evidence nor allegation that BridgeTek's corporate decisions are dominated by Con/Span. Hanson does refer to BridgeTek as Con/Span's "Texas sales arm," but Hanson alleges no facts on which the court could conclude that BridgeTek is, in fact, Con/Span's alter ego.

At most, Hanson provides evidence that Con/Span (1) owns a majority of BridgeTek stock, and (2) sits as one of five directors on BridgeTek's board.[24] Additionally, Hanson has supplied evidence that William Lockwood, a registered Con/Span Holdings executive, is listed as a "member" of BridgeTek.[25] Finally, Hanson argues that "BridgeTek and Con/Span companies even share the same address,"[26] but Hanson neglects to note that Con/Span shares an address with a corporation named BridgeTek Investments, LTD, while the named Defendant in this case is Bridge Technologies, LLC.

Regardless, even if all of Plaintiff's allegations are true, domination has not been shown. In circumstances similar to these, the Fifth Circuit has held that the plaintiff/subsidiary relationship is not an alter ego relationship. *See, e.g., Alpine View Co., Ltd.,* 205 F.3d at 219; *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 372–73 (5th Cir.1987).

In *Alpine View,* for example, the Fifth Circuit held that an alter ego relationship was not established when the plaintiff offered no evidence that the defendant parent corporation financed its subsidiary's operations; that the subsidiary was gross-

24. Appx. to Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue, Ex. 3, (Wonus Decl. at ¶ 13) & Ex. 10 (Texas Corp. Business Registration).

25. *Id.,* Ex. 11 (Con/Span & BridgeTek Business Registrations).

26. Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 6 (citing Appx. to Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue, Ex. 10 (Texas Corp. Business Registration)).

ly undercapitalized; that the parent paid the salaries or expenses of the subsidiary; that the parent used the subsidiary's property as its own; that the daily operations of the two corporations were not separate; or that the subsidiary did not observe corporate formalities. *Alpine View Co., Ltd.,* 205 F.3d at 219. The same evidentiary deficiency is present in this case, and thus, an alter ego relationship has not been established. *Id.* This is true notwithstanding the fact that BridgeTek sells only Con/Span products. *Bearry,* 818 F.2d at 372–73.

■ Independent of the alter ego allegation, Hanson argues that Con/Span has sufficient contacts with Texas to warrant the exercise of general jurisdiction. This court disagrees.

Essentially, Hanson argues that four types of contacts with Texas support the assertion of general personal jurisdiction: (1) Con/Span's contact with and sales through BridgeTek; (2) the invocation of Texas regulatory authority; (3) Con/Span's direct support to Texas customers; and (4) Con/Span's marketing.[27]

Regarding Con/Span's relationship with BridgeTek, Hanson argues that *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 899 (9th Cir.2002), supports its contention that Con/Span is subject to general jurisdiction in Texas.[28] This could not be less true. In *Mattel,* the Ninth Circuit upheld the district court's assertion of specific personal jurisdiction—not general personal jurisdiction. The distinction is significant. As noted above, specific personal jurisdiction is available over foreign defendants who have not maintained systematic and continuous contacts with the forum state because the alleged injury arises from the defendants contacts with the forum state. When a plaintiff attempts to invoke general personal jurisdiction, on the other hand, the contacts do not relate to the cause of action and must therefore be more significant. This is because in either situation, the "defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Where, as here, a foreign corporation merely sells its products to a resident subsidiary, the contacts are not significant enough to justify general jurisdiction. *Compare Bearry,* 818 F.2d at 372–76; *with Helicopteros Nacionales de Colombia, S.A.,* 466 U.S. at 414–15, 104 S.Ct. 1868 (1984) (discussing *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)). Based on Fifth Circuit and Supreme Court precedent, it is BridgeTek who is present and doing business in Texas, not Con/Span.

■ The alleged invocation of Texas regulatory authority does not ameliorate the relative dearth of contacts in this case. Regardless, Hanson claims that Con/Span applied for the Texas Department of Transportation's approval of the use of Con/Span bridge systems in Texas.[29] Hanson argues that Exhibit 13, found in Plaintiff's Appendix to Plaintiff's response to Con/Span's motion to dismiss, demonstrates that Con/Span applied for Texas's approval of its product. Exhibit 13, however, demonstrates no such thing. Exhibit 13, which is one of Con/Span's advertising materials, indicates that Con/Span bridges *have been* approved by the Texas Depart-

---

**27.** Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 4–5.

**28.** Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 5–6.

**29.** Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 5.

ment of Transportation, but does not indicate whether Con/Span actually requested the approval.[30]

In Con/Span's reply brief, Con/Span argues that "Hanson offers no proof that Con/Span—as opposed to BridgeTek or some other party—applied for 'regulatory approval.'"[31] Moreover, Con/Span argues that "Hanson offers no proof that any regulatory approval required an act in Texas as opposed to some other state."[32]

Hanson has chosen not to respond to these arguments, instead stating that Con/Span's "'Reply' raises no new issues, facts or law, but merely presents the Defendants' erroneous spin on matters already fully briefed."[33] "For that reason," Hanson argued, "Hanson does not here burden the Court with additional briefing. Briefing on Defendants' motions is—again—complete."[34]

Con/Span's reply brief, however, *was* the first instance in which Con/Span argued that Hanson cannot support its allegation that Con/Span applied for regulatory approval in Texas. Hanson's sur-reply would have been the appropriate time to counter Con/Span's argument, but Hanson chose to waive the opportunity. Thus, the court has nothing upon which to conclude that Con/Span purposefully availed itself of Texas's regulatory procedures.

Even if Con/Span did, however, seek Texas's approval of its products, the court finds that such an isolated contact is not tantamount to presence within the state.

Neither, for that matter, does Con/Span's representative's presence in Texas during the construction of a certain bridge and culvert project at Houston's Bush Intercontinental Airport give rise to general jurisdiction. The Con/Span arches were installed at the Bush Intercontinental Airport by a Miami, Florida, based contractor named PSB & J.[35] Apparently, "throughout the construction phase, PSB & J, CON/SPAN, and the local CON/SPAN provider, BridgeTek, provided onsite guidance."[36] This limited contact is insufficient to give rise to general jurisdiction. *See Helicopteros Nacionales de Colombia*, 466 U.S. at 416, 104 S.Ct. 1868 (finding no general jurisdiction over a foreign defendant whose contacts with Texas included "sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston Bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training").

Finally, Hanson has alleged that Con/Span's web site creates contacts with Texas that, when viewed in light of the other contacts discussed, are sufficient to justify general jurisdiction. Regarding Con/Span's website, Hanson states:

Con/Span's website admittedly permits customers to separately view Texas installations, permits contact with Texas

---

**30.** Appx. to Pl. Hanson's Resp. to Defs.' Mots. for Dismiss, Stay or Transfer Venue, Ex. 13 (Con/Span Advertisement).

**31.** Reply Mem. in Supp. of Mots. of Defs., Con/Span Bridge Sys., Ltd. & Bridge Tech. LLC, to Dismiss or Transfer Venue at 3.

**32.** *Id.*

**33.** Pl. Hanson's Sur-reply in Resp. to Defs.' "Mots." to Dismiss, Stay or Transfer Venue at 1.

**34.** *Id.*

**35.** Appx. to Pl. Hanson's Resp. to Defs.' Mots. for Dismiss, Stay or Transfer Venue, Ex. 15 (CE News).

**36.** *Id.*, Ex. 15 at 3 (CE News).

sales representative, and tout's Con/Span's installation at George Bush Int'l Airport in Houston as an example of its 'taxiway bridge' applications. Con/Span also nationally advertises not just its products generally, but its Texas installations specifically.[37]

Thus, it appears that Con/Span's website provides advertising to anyone who chooses to access it. This is evidenced by the pages from Con/Span's website that Hanson has provided for the court to view.[38] From the pages provided, it appears that Con/Span's website does exactly what Hanson alleges; it provides contact information for a BridgeTek representative, and it provides information regarding Con/Span arches that have been purchased and installed in Texas, as well as other states.

Thus, from Hanson's allegations, it appears to the court that Con/Span maintains a " 'passive' website," which is "one that merely allows the owner to post information on the internet ...."[39] *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir.2002). Such a website is not sufficient to establish personal jurisdiction. *Id.* It is easy to understand why. In *Revell,* the Fifth Circuit recognized that "the maintenance of a website is, in a sense, a continuous presence everywhere in the world," but noted that even repeated business contacts

through a website are "not in any way 'substantial.'" *Id.* (citing *Wilson v. Belin,* 20 F.3d 644, 650–51 (5th Cir.1994), for the proposition that courts should find "no personal jurisdiction over ... defendants where the defendants [do] not conduct regular business in Texas and [do] not make a substantial part of their business decisions in Texas"). In this case, Con/Span's contacts with Texas are simply not substantial or continuous. The fact that Con/Span had an agent or agents in Texas on one occasion to provide "onsite support" for an unspecified amount of time, and the fact that Con/Span owns stock in a subsidiary, which makes money selling Con/Span products in Texas, are insufficient to establish general jurisdiction for all the reasons stated above, and the court finds that it would be unreasonable to force Con/Span, an Ohio corporation, to defend a law suit in Texas that is unrelated to the limited contacts Con/Span actually has made with this forum.

### 2. Specific Jurisdiction

■ "Specific jurisdiction may be found when a foreign defendant 'has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities.'" *Religious Tech.*

---

**37.** Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 6.

**38.** Appx. to Pl. Hanson's Resp. to Defs.' Mots. for Dismiss, Stay or Transfer Venue, Ex. 14 (Con/Span Website) & Ex. 12 (Con/Span Website).

**39.** Additionally, Hanson claims, but offers no evidence to prove, that Con/Span's website "permits customers to download technical manuals, view process films, download software, request information, and submit comments." Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 7. Assuming that this is true, the court cannot find any purposeful availment of the benefits of the laws of Texas. It matters little whether

a user of Con/Span's website can readily access the information they need or they need to request it. "Downloading" is also of little consequence because everything the a user views "on the internet" is downloaded to their computer.

If Con/Span were entering into contracts through its website, which created obligations in Texas, this might constitute minimum contacts and purposeful availment for the purpose of specific jurisdiction, but even then, the contacts would have to give rise to the cause of action. *Felch,* 92 F.3d at 324. As the court will explain below, that is not the case here.

*Ctr.*, 339 F.3d at 375 (quoting *Burger King Corp.*, 471 U.S. at 472, 105 S.Ct. 2174 (1985) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) and *Helicopteros Nacionales de Colombia*, 466 U.S. at 414, 104 S.Ct. 1868)); *Bearry*, 818 F.2d at 374; *Helicopteros Nacionales de Colombia*, 466 U.S. at 415–16, 104 S.Ct. 1868 (holding that the court must look for continuous and systematic general business contacts—i.e., general jurisdiction—if the causes of action do not arise from or relate to the foreign defendant's contacts with the forum state).

The court has already discussed the contacts alleged in this case: (1) Con/Span's contact with and sales through BridgeTek; (2) the invocation of Texas regulatory authority; (3) Con/Span's direct support to Texas customers; and (4) Con/Span's marketing.[40] None of these contacts gives rise to the cause of action in this case. Specifically, in this lawsuit, Hanson pursues the following twelve causes of action:

(1) Con/Span tortiously interfered with an existing contract between Hanson and Spillman by falsely claiming that Spillman's manufacture of custom bridge forms for Hanson would violate Con/Span's trade mark and trade dress rights;

(2) Con/Span tortiously interfered with a prospective contract between Hanson and Spillman by falsely claiming that Spillman's future manufacture of custom bridge forms for Hanson would violate Con/Span's trade mark and trade dress rights;

(3) Con/Span tortiously interfered with a prospective contract between Hanson and Beaver Excavating by falsely claiming that Beaver's purchase of modular bridge systems from Hanson would violate Con/Span's trademark and trade dress rights;

(4) Con/Span and BridgeTek have violated the Lanham Act by making false representations regarding their trademark and trade dress rights to Spillman, Beaver and SGH;

(5) Con/Span and BridgeTek have engaged in unfair competition through their false statements regarding their trademark and trade dress rights;

(6) Hanson seeks declaratory judgment that its actions do not violate Con/Span and BridgeTek's trademark and trade dress rights;

(7) Con/Span tortiously interfered with an existing contract between Hanson and Spillman by falsely claiming that Spillman's manufacture of custom bridge forms for Hanson would violate Con/Span's intellectual property rights other than Con/Span's trademark and trade dress rights;

(8) Con/Span tortiously interfered with a prospective contract between Hanson and Spillman by falsely claiming that Spillman's future manufacture of custom bridge forms for Hanson would violate Con/Span's intellectual property rights other than Con/Span's trademark and trade dress rights;

(9) Con/Span tortiously interfered with a prospective contract between Hanson and Beaver Excavating by falsely claiming that Beaver's purchase of modular bridge systems from Hanson would violate Con/Span's intellectual property rights other than Con/Span's trademark and trade dress rights;

(10) Con/Span and BridgeTek have violated the Lanham Act by making false representations regarding their intellectual property rights other than their

---

**40.** Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 4–5.

trademark and trade dress rights to Spillman, Beaver and SGH;

(11) Con/Span and BridgeTek have engaged in unfair competition through their false statements regarding their intellectual property rights other than their trademark and trade dress rights;

(12) Hanson seeks declaratory judgment that its actions do not violate Con/Span and BridgeTek's intellectual property rights apart from their trademark and trade dress rights.

It should be obvious from a review of Hanson's claims, that Hanson's causes of action do not arise from or relate to Con/Span's Texas contacts. Significantly, neither Spillman, Beaver nor SGH are Texas residents. These corporations all appear to reside in either Ohio or Massachusetts.[41] Indeed, Con/Span has represented that Spillman and Beaver are Ohio residents, which have their principal places of business in Ohio.[42]

Also significantly, Hanson has supplied no evidence—and, in fact has not argued—that Con/Span either contacted these firms in Texas, contacted these firms regarding Texas, or directed any communication whatsoever regarding its alleged intellectual property rights toward Texas. To the contrary, Hanson's Exhibit 18 demonstrates that Con/Span contacted SGH in Massachusetts and Spillman in Ohio.[43]

Con/Span agrees. In its motion to dismiss, Con/Span represents that "[t]he supposed communications originated in *Ohio,* were directed to *Ohio* residents, and concerned activities in *Ohio.*"[44] Moreover, Con/Span represents that "[t]he contracts with which Con/Span supposedly interfered were to be performed in *Ohio.*"[45]

To the extent that Con/Span does have contacts with Texas,[46] those contacts do not give rise or relate to the allegedly fraudulent statements that Con/Span, an Ohio corporation, made to Spillman, Beaver and SGH. There is, for lack of a better term, no Texas nexus.

The lack of a nexus with this forum state is confirmed by statements made in the sworn declaration of Joan Blecha, provided by Hanson. Ms. Blecha serves as the President of Hanson Pipe & Products, Inc., Southeast Region, and resides in Florida.[47] Ms. Blecha swears in her declaration that, since Hanson began marketing its HansonArch bridge system, Hanson has "bid on numerous contracts in at least four states: Ohio, Florida, Georgia, and Arkansas."[48] Notably, she fails to mention Texas. Additionally, Blecha stated that fulfillment of the Spillman contract, with which Con/Span interfered, was necessary to enable Hanson to fulfill a contractual obligation to supply HansonArch bridge systems for a project in Georgia.[49]

---

41. Appx. to Pl. Hanson's Resp. to Defs.' Mots. for Dismiss, Stay or Transfer Venue, Ex. 18 at 1–4 (Letters to SGH & Spillman); *see also* First Am. Compl., ¶ 13 (indicating that Hanson's potential contract to supply Beaver Excavating's pre-cast modular bridge systems was for a project to occur in Canton, Ohio).

42. Mot. of Def., Con/Span Bridge Sys., Ltd. to Dismiss or Transfer Venue at 14.

43. Appx. to Pl. Hanson's Resp. to Defs.' Mots. for Dismiss, Stay or Transfer Venue, Ex. 18 at 1–4 (Letters to SGH & Spillman).

44. Mot. of Def., Con/Span Bridge Sys., Ltd. to Dismiss or Transfer Venue at 14.

45. *Id.*

46. The court has discussed them *ad nauseam* and does not need to state them again.

47. Appx. to Pl. Hanson's Resp. to Defs.' Mots. for Dismiss, Stay or Transfer Venue, Ex. 1, ¶ 1 (Blecha decl.).

48. *Id.*, Ex. 1, ¶ 17 (Blecha decl.).

49. *Id.*, Ex. 1, ¶ 20 (Blecha decl.).

Again, a Texas nexus is conspicuously absent. Then, Blecha claims that after Con/Span mailed its letters, she and her staff "have been required to spend considerable time and effort assuring customers and suppliers located in Florida, Ohio, and Georgia that Con/Span and BridgeTek's infringement accusations are without merit." [50] This portion of the declaration presented a prime opportunity for Blecha to have mentioned any adverse effects suffered in Texas, but she did not.

Finally, Blecha does mention Texas, stating that "Con/Span and BridgeTek's threats and other improper conduct *has possibly* damaged Hanson's goodwill and reputation in Texas as well, which *would have* an adverse effect on the market for the HansonArch bridge system in Texas." [51] This statement doesn't even allege that Hanson has felt any adverse effects in Texas. It just states that Hanson might have . . . possibly.

As further support, Hanson has provided the sworn declaration of Charles M. Taylor III, P.E., who states that "Hanson actively markets and promotes its HansonArch products in Texas and within this judicial district." [52] Notably, Mr. Taylor does not allege that Hanson's business in Texas has been injured in any way by Con/Span's actions in Ohio.

In fact, Hanson has not presented any evidence of a single injury occurring in Texas arising from or related to Con/Span's out-of-state actions.

Nonetheless, Hanson argues that specific jurisdiction is proper, and proffers two theories to support its argument. First, Hanson argues that "when a trademark dispute involves competing products in the same forum, there exists a significant nexus for the exercise of specific personal jurisdiction." [53] Hanson cites *Al–Or International Ltd. v. Paul Morelli Design, Inc.*, 53 U.S.P.Q.2d 1191, 1193, 1999 WL 1320317 (C.D.Cal.1999), to support its argument. Even if this were controlling authority in this jurisdiction—which it is not—*Al-Or International* does not support Hanson's argument. In contrast with the case at bar, the plaintiff in *Al–Or International* was a California resident and a trademark holder suing a foreign defendant for an infringement occurring in California. 53 U.S.P.Q.2d at 1192, 1999 WL 1320317. The District Court for the Central District of California held that the foreign defendant had purposefully availed itself of the forum state because the defendant had advertised and sold allegedly infringing products in California. *Id.*, at 1193, 1999 WL 1320317. In other words, the defendant sold a product in California, thereby violating a California resident's rights. This court cannot stress enough the fact that, unlike the present case, the violations in *Al–Or International* occurred in the forum state.

In this case, Hanson's causes of action have nothing to do with the sale of Con/Span products in Texas. There is no allegation that BridgeTek's sale of Con/Span bridges in Texas infringes any of Hanson's rights. Rather, Hanson seeks to ensure that it's actions do not violate Con/Span's intellectual property rights because it has been harmed—in other forums—by Con/Span's assertion of those rights—in other forums. This harm is not related, in any way, to Con/Span's relationship with BridgeTek, Con/Span's website, Con/Span's

---

**50.** *Id.*, Ex. 1, ¶ 29 (Blecha decl.).

**51.** *Id.*, Ex. 1, ¶ 35 (Blecha decl.) (emphasis added).

**52.** *Id.*, Ex. 2, ¶ 3 (Taylor decl.).

**53.** Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 10.

representatives' presence at the airport in Houston, or the fact that the Texas Department of Transportation approves of Con/Span bridges.

In *Ham v. La Cienega Music Company,* 4 F.3d 413, 416 (5th Cir.1993), the Fifth Circuit held that a non-resident defendant's distribution of its product into a forum jurisdiction does not constitute sufficient contacts to justify the assertion of specific jurisdiction in a declaratory judgment action in which the resident plaintiff seeks a declaration of the defendant's intellectual property rights. This is precisely the situation in the present case. Hanson alleges no injury flowing from Con/Span's purported Texas contacts, and thus, specific jurisdiction is improper. *Id.*

In Hanson's second argument, Hanson alleges that it "feels the effect" in Texas of the contracts it breached in other forums.[54] Specifically, Hanson alleges "Hanson's Texas headquarters did not realize the revenues from those contracts, and Hanson could be sued in Texas as a result of their breach."[55]

These facts may have been sufficient to establish personal jurisdiction in California, *see Bancroft & Masters, Inc. v. Augusta Nat., Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000) (holding that, in the Ninth Circuit, the "effects" test established in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), is met when a foreign defendant does a wrongful act to a foreign resident, without regard to whether the actual act is targeted at the forum), but in the Fifth Circuit, the rule is different. The Fifth Circuit has plainly stated that "the plaintiff's residence in the forum", and suffering of harm there, will not alone support jurisdiction under *Calder. Revell,* 317 F.3d at 473. In *Revell v. Li-*

*dov*—a defamation case in which non-resident defendant wrote an unflattering article about a Texas resident in a journal published outside the State of Texas—the Fifth Circuit found "insurmountable hurdles to the exercise of personal jurisdiction" when:

> the article written by Lidov about Revell contains no reference to Texas, nor does it refer to the Texas activities of Revell, and it was not directed at Texas readers as distinguished from readers in other states. Texas was not the focal point of the article or the harm suffered, unlike *Calder,* in which the article contained descriptions of the California activities of the plaintiff, drew upon California sources, and found its largest audience in California.

*Id.* If specific jurisdiction was inappropriate in *Revell,* it is certainly inappropriate here.

Having found that minimum contacts do not exist, the court finds that personal jurisdiction over Defendant Con/Span is improper. Con/Span's motion to dismiss it therefore GRANTED.

### B. Hanson's Claims Against Defendant BridgeTek Must be Dismissed Pending Arbitration

■ The parties agree that personal and subject matter jurisdiction exist over Defendant BridgeTek, but disagree about whether this action should be dismissed pending arbitration. The license agreement discussed above contains an arbitration provision, necessitating an inquiry into the question of arbitrability.

Specifically, in Hanson's agreement to license the bridge technology from Con/Span, Hanson agreed that it would "neither during the term of this Agreement

---

**54.** Pl. Hanson's Opposition to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 10.

**55.** *Id.*

nor after the expiration or termination of this Agreement ... directly nor indirectly contest or aid in the contesting of the validity or ownership of the Licensed Technology or Trademark or take any action whatsoever in derogation of Licensor's rights." [56] In the motion before the court, Defendant BridgeTek argues that Hanson's request for declaratory judgment requires an interpretation of this contractual provision. Thus, BridgeTek argues that the arbitration provision of that same agreement is applicable. The arbitration provision reads, "[a]ll disputes arising between the parties hereto in connection with this Agreement and which cannot be settled by discussion and mutual accord, shall be settled in Dayton, Ohio in accordance with the Rules of the American Arbitration Association ...." [57] Hanson argues that arbitration is inappropriate for reasons the court will discuss below.

The effect of the Federal Arbitration Act ("FAA") is "to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Section 2 of the FAA states in relevant part

> [a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Supreme Court has stated that Congress's "clear intent" evidenced by the FAA is "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 22, 103 S.Ct. 927. This intent is evidenced by Congress's inclusion in the FAA of two parallel devices through which courts may enforce arbitration agreements. Under Section 3 of the FAA, courts are granted the power to stay litigation upon the request of a party when the court is convinced that arbitration is appropriate. 9 U.S.C. § 3; *see also Moses H. Cone Memorial Hosp.*, 460 U.S. at 22, 103 S.Ct. 927. Under Section 4, a court is empowered to affirmatively order parties to arbitrate disputes when the court is convinced that arbitration is proper but one or more parties has failed to arbitrate. 9 U.S.C. § 4; *see also Moses H. Cone Memorial Hosp.*, 460 U.S. at 22, 103 S.Ct. 927. Apart from Sections 3 and 4, the Fifth Circuit has held that a district court may dismiss without prejudice an action in which all of the claims must be submitted to arbitration after ordering the mandatory arbitration. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir.1992) (citations omitted); *Fedmet Corp. v. M/V BUYALYK*, 194 F.3d 674, 678 (5th Cir.1999).

The Fifth Circuit has followed the Supreme Court's holding that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *OPE Intern. LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445 (5th Cir.2001) (quoting *Moses H. Cone Memo-*

---

**56.** Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp, Ex. 5 at 2 (License Agreement).

**57.** Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp, Ex. 5 at 6 (License Agreement).

*rial Hosp.,* 460 U.S. at 24–25, 103 S.Ct. 927).

Regarding whether parties must be compelled to submit to arbitration, the Fifth Circuit has outlined a two-step inquiry. *OPE Intern. LP,* 258 F.3d at 445.

First, the court must determine "whether the parties agreed to arbitrate their dispute." *Id.* This is important because, "a party cannot be compelled to submit any dispute to arbitration which he has not agreed to submit." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.,* 139 F.3d 1061, 1064 (5th Cir.1998) (quoting *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). Whether the parties agreed to arbitrate is determined by " '(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.' " *OPE Intern. LP,* 258 F.3d at 445 (quoting *Webb v. Investacorp, Inc.,* 89 F.3d 252, 257–58 (5th Cir.1996)). Courts should resolve these questions by applying "ordinary state-law principles that govern the formation of contracts." *Id.* As such, "the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Pennzoil Exploration & Prod. Co.,* 139 F.3d at 1065 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–*

*Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444(1985)).

Second, "the court must assess 'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.' " *Id.* (quoting *Mitsubishi Motors Corp.,* 473 U.S. at 628, 105 S.Ct. 3346). In this case, there appears to be no disagreement regarding the second prong of the Fifth Circuit's test.[58] When a party responds to its opponent's motion but chooses to ignore one of its opponent's arguments, the court assumes that the party has no opposition to that argument. EASTERN DIST. TEX.R. CV–7(d). Thus, the court need only consider prong one, regarding whether the parties agreed to arbitrate.[59]

In this case, the licensing agreement containing the arbitration clause has expired. Specifically, paragraph 13 of the May 9, 1989, license agreement states, "[t]he term of this Agreement shall commence as of the date of execution hereof and shall continue until the expiration date of the last U.S. patent included in the Licensed Technology, unless earlier terminated by mutual agreement of the parties or as provided under this Agreement."[60] Plaintiff and Defendants agree that the patents relevant to the "Licensed Technol-

**58.** *Compare* Def. BridgeTek's Mot. to Dismiss, Stay, or Transfer Venue & Br. in Supp. at 12 (arguing that "[t]here is no federal statute or policy that renders Hanson's claims nonarbitrable") *with* Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 30–44 (ignoring Defendants' argument regarding the second prong of the Fifth Circuit's arbitrability test) *and* Pl. Hanson's Opposition to Defs.' "Mots." to Dismiss, Stay or Transfer Venue at 15–17 (same).

**59.** Though BridgeTek admits that it is not a signatory to the arbitration agreement between Hanson and Con/Span, BridgeTek claims that it is nonetheless entitled to compel

arbitration. Def. BridgeTek's Mot. to Dismiss, Stay, or Transfer Venue & Br. in Supp. at 7–8. Notwithstanding Hanson's argument that the present dispute is not proper for arbitration because it does not arise in connection with the license agreement containing the arbitration agreement, Hanson appears not to dispute BridgeTek's argument that it is entitled to enforce arbitration to the extent that the arbitration agreement does apply.

**60.** Appx. to Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue, Ex. 5 at 5 (License Agreement).

ogy" have expired.[61] Thus, the licensing agreement has expired.

Hanson argues that once the licensing agreement has expired, an arbitration clause included in that agreement applies "only where a dispute has its real source in the contract." [62] In *Litton Financial Printing Division v. National Labor Relations Board*, the Supreme Court held that an arbitration clause only applies to a grievance arising after the expiration of the agreement

> [1] where it involves facts and occurrences that arose before expiration, [2] where an action taken after expiration infringes a right that accrued or vested under the agreement, or [3] where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

501 U.S. 190, 206, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). The Court recognized this limitation to the applicability of arbitration clauses to flesh out its prior holding in *Nolde Brothers, Inc. v. Bakery Workers*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). In *Nolde Brothers*, the Court held that "it could not seriously be contended . . . that the expiration of the contract would terminate the parties' contractual obligation to resolve [disputes arising under the contract] in an arbitral, rather than a judicial forum." 430 U.S. at 251, 97 S.Ct. 1067. Though the *Nolde Brothers* Court held that "in the absence of some contrary indication, there are strong reasons to conclude that . . . parties [do] not intend their arbitration duties to terminate automatically with the contract," this holding appears to be limited to circumstances in which the dispute necessarily involves the interpretation of some provision of the agreement. *Id.*, at 253, 97 S.Ct. 1067. This limitation is confirmed by the Supreme Court's holding in *Litton Financial Printing Division*, which states that *Nolde Brothers* applies "only where a dispute has its real source in the contract." 501 U.S. at 205, 111 S.Ct. 2215.

In this case, it appears that the entire dispute has its real source in the contract. As noted above, the impetus for this action was Defendants' assertions to Plaintiff's customer and suppliers that Plaintiff's business violates Defendants' intellectual property rights.

Specifically, in a letter from Con/Span to SHG, one of Hanson's suppliers, Con/Span wrote, "the CON/SPAN Arch is a federally licensed trademark" and that the "[u]se of the CON/SPAN shape could expose SGH to the liability associated with the improper use of a trademark." [63] Further, the letter stated, "I might add that the CON/SPAN Arch shape also can be protected under 'common law' principles and under a particular section of the Federal Trademark Act (§ 43(a)) that does not even require registration." [64]

Based on this and similar communications, Hanson argues that "[t]he Defendants are continuing to engage in a pattern of harassment and intimidation by asserting non-existent intellectual property rights against Hanson's existing and po-

---

**61.** Def. BridgeTek's Mot. to Dismiss, Stay, or Transfer Venue & Br. in Supp. at 3; Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 2.

**62.** Pl. Hanson's Resp. to Defs.' Mots. to Dismiss, Stay or Transfer Venue at 31 (quoting *Litton Financial Printing Div. v. Nat'l Labor Relations Bd.*, 501 U.S. 190, 205, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991)).

**63.** Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp, Ex. 5 at 1 (Germain Letter).

**64.** *Id.*

tential customers and suppliers." [65] Though the parties disagree about the extent and legitimacy of Defendants' purported intellectual property rights in their previously-patented bridge and culvert systems, that disagreement *is* the crux of this dispute. Without determining the legitimacy of Defendants' alleged intellectual property rights, it would be impossible to determine whether Defendants' communications with Plaintiff's customers and suppliers constitute legitimate requests or illegitimate harassment. The necessity of such a determination is significant.

In the license agreement that bound Con/Span and Hanson, the parties agreed that the licensee, which is Hanson, would "neither during the term of this Agreement *nor after the expiration or termination of this Agreement* ... directly nor indirectly contest or aid in the contesting of the validity or ownership of the Licensed Technology or Trademark *or take any action whatsoever in derogation of Licensor's rights.*" Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp, Ex. 5 at 2 (License Agreement) (emphasis added).

Thus, the parties obviously established certain rights, which they intended to endure beyond the termination of the license agreement. The court notes that the plain language of the parties' agreement is buttressed by an integration clause, which states, "[t]his agreement contains the entire understanding of the parties with respect to the matter contained herein. There are no promises, covenants or undertakings other than those expressly set forth herein. The Agreement may not be modified, except in writing and signed by both parties." Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp, Ex. 5 at 6–7 (License Agreement). Accordingly, the

parties' unambiguous words must be taken at their face value. *Union Pacific R.R. Co. v. Novus Intern., Inc.*, 113 S.W.3d 418, 423 n. 3 (Tex.App.-Houston [1 Dist.] 2003, pet. denied) (quoting *Smith v. Smith,* 794 S.W.2d 823, 828 (Tex.App.-Dallas 1990, no writ)).

Here the parties agreed that, for all eternity, Hanson would not take "any action whatsoever" in derogation of Con/Span's rights. The court·is not aware of any meaning that may be assigned to this clause other than the obvious one. Hanson is bound not operate its business in violation of Con/Span's "rights," whatever those may be. If there is an acceptable alternate interpretation of this provision, it is outside the court's grasp.

Nothing, of course, prohibits Hanson from seeking clarification of what exactly constitutes Con/Span's "rights." The language of the license agreement does, however, specify the forum in which such an inquiry must occur.

Specifically, paragraph 21 of the license agreement states in relevant part, "[a]ll disputes arising between the parties hereto in connection with this Agreement and which cannot be settled by discussion and mutual accord, shall be settled in Dayton, Ohio in accordance with the Rules of the American Arbitration Association ...." [66]

The court has already noted that the Supreme Court, in *Litton Financial Printing Division,* held that an arbitration clause applies to a grievance arising after the expiration of the agreement when "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." 501 U.S. at 205–06, 111 S.Ct.

---

65. Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp at 4.

66. Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp, Ex. 5 at 6 (License Agreement).

2215. That is exactly the case here. Defendants are entitled to demand arbitration because Plaintiff has sought a ruling of this court regarding the scope and legitimacy of the intellectual property rights Defendants claim to possess in their bridge system. If Defendants' *do* possess intellectual property rights in their bridge system, then Hanson's action could be rationally viewed as an action in derogation of those rights.

In the court's view, Plaintiff Hanson's argument that the rights asserted by Defendants in the various cease and desist letters are not the rights specifically referenced in the license agreement does little to contradict the otherwise obvious arbitrability of Plaintiff's claims. This is so because of the broad language the parties used to describe both their intention to arbitrate and the types of rights covered by the agreement.

When Hanson agreed to take no "action whatsoever in derogation of Licensor's rights," this agreement must be read in context with the one immediately preceding it, in which Hanson agreed to neither "directly nor indirectly contest or aid in the contesting of the validity or ownership of the Licensed Technology or Trademark ...." [67] If Hanson intended to enter a contract regarding only the explicitly described "Licensed Technology or Trademark," then Hanson should not have signed the license agreement at issue here. Instead, by signing, Hanson agreed to an additional obligation, namely, the obligation to never take any "action whatsoever in derogation of Licensor's rights." The reason that the court cannot interpret this provision as merely redundantly restating Hanson's obligation regarding Con/Span's "Licensed Technology or Trade-

mark" is that the parties selected to use the disjunctive conjunction "or" between the clauses. This signifies that the parties meant something different in the second clause than they meant in the first clause. Thus, the parties must have intended to extend the scope of their agreement beyond the Licensed Technology and Trademark. Such an interpretation is consistent with Texas contract law, which states that "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *K3 Enterprises v. McDaniel,* 8 S.W.3d 455, 458 (Tex.App.-Waco 2000, pet. denied) (citing *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154 (1951)).

Additionally, the parties selected broad language for their arbitration clause, when they expressed their intent to arbitrate "[a]ll disputes arising between the parties hereto in connection with this Agreement ...." *Pennzoil Exploration & Prod. Co.,* 139 F.3d at 1067 ("courts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract").

In light of these determinations, as well as the Fifth Circuit's holding that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *OPE Intern. LP,* 258 F.3d at 445, the court finds that (1) there is a valid agreement to arbitrate between the parties and (2) the dispute falls within the scope of that arbitration agreement. Dismissal pending arbitration is therefore appropriate. *OPE*

---

**67.** Mot. to Stay Prelim. Inj. Proceedings & Mem. in Supp, Ex. 5 at 2 (License Agreement).

*Intern. LP*, 258 F.3d at 445 (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir.1996)).

Defendant Bridge/Tek's motion to dismiss pending arbitration is therefore GRANTED.

## III. CONCLUSION

Consistent with the discussion above, Defendants' motions to dismiss are GRANTED. Plaintiff Hanson and Defendant BridgeTek are hereby ORDERED to arbitrate this dispute consistent with their agreement, and this case is DISMISSED without prejudice pending arbitration. Plaintiff's claims against Defendant Con/ Span are DISMISSED for lack of personal jurisdiction. All other pending motions are rendered MOOT by virtue of this decision.

It is so ORDERED.